IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
                              )
MICHAEL L. KOVENS,            )
                              )
            Plaintiff,        )
                              )
      v.                      )   C. A. No. 1:04 Civ. 2238 (TPG)
                              )
                              )
BRUCE H. PAUL,                )
                              )
            Defendant.        )
_____)

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
### TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Michael L. Kovens ("Kovens"), by and through counsel, hereby submits this Memorandum of Law in Opposition to the Motion for Summary Judgment filed by Defendant Bruce H. Paul ("Paul"), and as grounds therefore states as follows:

### INTRODUCTION

The Motion for Summary Judgment filed by Paul is a slipshod pleading replete with unnecessary jury argument, which misinterprets the Kovens deposition testimony and ignores a plethora of other evidence which supports the conclusion that Paul and Kovens entered into an agreement for Kovens to purchase the 171,000 shares of stock owned by Paul and members of his family and friends in Universal Security Instruments, Inc. ("USI") at a price of $2.85 per share, to be paid from an escrow account at Morgan Stanley after a special

meeting of USI shareholders was held, or until such time that a meeting could not be held.  As explained below, if the relevant evidence is considered, and all reasonable inferences are made therefrom, Paul has not sustained his heavy burden for this Court to enter summary judgment in his favor.

### **FACTUAL BACKGROUND**

Kovens was a founder of USI and served as a member of its Board of Directors from 1969 until October 2003. Complaint at ¶1; Declaration of Michael L. Kovens ("Kovens Declaration") at ¶2, attached hereto as Exhibit A.  From 1969 until 1996 he was the President and Co-Chief Executive Officer of USI.  Id. From 1996 until October 22, 2001 he served as the Chairman of the Board of Directors and sole Chief Executive Officer ("CEO").  Id.

As of October 2001, Kovens owned approximately 285,000 shares of USI stock, representing approximately 33% of all outstanding shares of USI stock.  Kovens Declaration at ¶3, Exhibit A; Complaint at ¶7.  Paul held and/or controlled the second largest block of USI stock, consisting of 171,000 shares, representing approximately 17% of all outstanding shares of USI stock.  Id.

On October 22, 2001, Stephen C. Knepper ("Knepper") persuaded the Board of Directors of USI to terminate Kovens'

2

employment as USI's Chairman of the Board and CEO, and to elect Knepper as the Chairman and CEO.  Kovens Declaration at ¶4, Exhibit A; Complaint at ¶8.

On or about October 27, 2001, Kovens began discussions with Jerome Feldman ("Feldman"), a stockbroker and close personal friend of Paul, regarding the possibility of entering into an agreement whereby Paul would sell and Kovens would purchase the USI stock owned and/or controlled by Paul. Kovens Declaration at ¶5, Exhibit A; Complaint at ¶10.  On or about October 28, 2001, Kovens met with Feldman in New York to discuss the purchase of Paul's stock.  Id.; Transcript of Deposition of Michael L. Kovens ("Kovens Transcript") at 32/25-33/17, attached as Exhibit B to Defendant's Motion. During the meeting Kovens made an offer to purchase 120,000 shares of USI stock owned by Paul at a price of $2.70 per share.  Kovens Declaration at ¶5, Exhibit A; Kovens Transcript at 28/9-28/13, Exhibit B to Defendant's Motion.  Feldman, on behalf of Paul, responded with a counter offer, which was that Paul would accept $2.85 per share for all the shares of USI stock Paul owned or controlled, which was 171,000 shares. Kovens Declaration at ¶5, Exhibit A; Kovens Transcript at 31/11-31/18, Exhibit B to Defendant's Motion.  On or about October 29, 2001, Kovens told Feldman that he accepted the

counter offer from Paul.  Kovens Declaration at ¶5, Exhibit A;
Kovens Transcript at 38/18-39/9, Exhibit B to Defendant's
Motion.  The total price Kovens agreed to pay for the stock
was $487,350 (171,000 x $2.85 = $487,350), plus $25,000 for
Feldman and $150 in wire transfer fees.  Kovens Declaration at
¶5, Exhibit A; Complaint at ¶12.  Feldman, on behalf of Paul,
told Kovens that he had to wire the money to purchase the
shares into an escrow account maintained by Paul's
stockbroker, Marc Taubin ("Taubin"), at Morgan Stanley in New
York, which Kovens agreed to do.  Kovens Declaration at ¶5,
Exhibit A; Complaint at ¶15; Kovens Transcript at 39/7-39/13,
Exhibit B to Defendant's Motion.  Additionally, Kovens agreed
to pay a $25,000 fee to Feldman for his work on the
transaction.  Kovens Declaration at ¶5, Exhibit A; Complaint
at ¶5.  As stated in the Complaint, "[t]he date for settlement
was scheduled for November 2, 2001."  Complaint at ¶12.

     In his deposition Paul admitted he insisted that Kovens
deposit the money into an account at the office of Paul's
broker.  Deposition Transcript of Bruce H. Paul ("Paul
Transcript"), attached as Exhibit B at 15/5-15/10.  He also
testified that he discussed a potential sale of his stock to
Kovens with Taubin before the money was wired into the escrow
account.  Id. at 78/7-78/15.

In his deposition Taubin testified that he learned from Paul sometime in October, or possibly in September, 2001, that Paul and Kovens had entered into a deal where Paul was going to sell his stock to Kovens at a specific price per share. Deposition Transcript of Marc Taubin ("Taubin Transcript") attached as Exhibit C at 10/2-11/16 and 28/7-28/24.   In pertinent parts, the transcript reads:

> When you first heard of this notion that Mr. Paul might sell his Universal stock to Kovens, was it a phone, meeting or what?
>
> A   Phone call.
>
> Q   And tell us, the best you can recall, what Mr. Paul said to you about the transaction with Mr. Kovens?
>
> A   The best of my recollection, I did not know Mr. Kovens at the time, so it was that Mr. Paul was going to sell shares to another person at a specific price.   That price to the penny, I don't recall, but it was a premium to the current market price at that time.   He had given me the name of the interested parties which was Mr. Kovens and I believe maybe a law firm.   And he said that he wanted an account to be set up for Mr. Kovens so that when a deal took place, the money would go into that account, the stock would go into that account by each respective party.   And that's how they would facilitate the transaction.
>
> Q   When he first talked to you about it, is it your recollection that they had arrived at a price per share price?   I understand you don't know what the price was.
>
> A   I do recall it was a premium to the market price at the time.   I don't recall the exact price.   If you wanted me to take a stab at it, I can tell you that I do recall the stock trading in the one dollar, one dollar and change range.   I don't know if it was $1.00 or $1.90,

I'am almost certain that the price that was agreed upon
was in the high $2 per share range.

* * * * * * * * * *

Q  If I understand the thrust of your testimony so
far, I want you to correct me if I'm wrong.  You hear
from Paul, sometime in October, that he and Kovens had
entered into a deal whereby he was going to sell stock to
Kovens at some price; is that a fair statement?

A  It might have been actually in September.  It
might have been a few weeks prior to opening the account.
**Yes, that's a fair statement.**

Exhibit C at 10/2-11/16 and 28/7-28/24 (emphasis supplied).

Taubin further testified that Kovens and Paul had determined a

total price for the shares, and that he was advised by Paul

that the money would be wired into the escrow account.  The

transcript reads:

Q  Did you understand that from your conversations
with Paul that's how it would be done?

A  I understood it from Mr. Paul that he and Mr.
Kovens had obviously determined a price based upon a
number of shares, and he would send over or actually I do
recall with Mr. Paul saying it would be around $500,000.
Approximately $500,000.

Q  So when the wire transfer - strike that.  When
the money came in to be deposited into the account, you
had already been advised that it was coming -

A  Yes.

Q  - by Mr. Paul?

A  Right.  I was advised by both parties.  I knew
the money - well, yes.

Id. at 16/14-17/7.

Between October 30 and November 1, 2001, Kovens wired $512,500 into an escrow account maintained by Taubin, at Morgan Stanley.  Kovens Declaration at ¶6, Exhibit A; Complaint at ¶15.  A copy of the statements from Morgan Stanley reflecting the wire transfers is attached as Exhibit D.  The $512,500 represented $487,350 for the purchase of Paul's stock, $25,000 for Feldman and $150 in wire transfer fees.  Kovens Declaration at ¶6, Exhibit A; Complaint at ¶15.

On or about November 1, 2001, Kovens learned of the Maryland Control Share Acquisition Act and informed Feldman. Kovens Declaration at ¶7, Exhibit A.  On November 2, 2001, there was a meeting at the offices of Paul's attorney in New York, William J. Poltarak, Esq. ("Poltarak") at the law firm Zeichner, Ellman & Krause, LLP, attended by Kovens, Paul, Poltarak, Feldman, Lowell Bowen, Esq. ("Bowen") Kovens' attorney, and Ronnie Frank ("Frank"), Kovens' son-in-law. Id.; Declaration of Ronnie Frank ("Frank Declaration") at ¶4, attached as Exhibit C.  At this meeting the provisions of the Maryland Control Share Acquisition Act were explained.  Id.; Kovens Transcript at 46/5-47/8, Exhibit B to Defendant's Motion.  At this meeting Paul agreed to sign a request for a special meeting of shareholders of USI.  Id.  Paul also agreed

to defer the settlement for the sale of his stock to Kovens until after the special meeting of shareholders was held, or until such time that a special meeting could not be held. Id.; Kovens Transcript at 48/5-48/22 and 87/20-88/8, Exhibit B to Defendant's Motion.  During the meeting, Paul asked Kovens to increase the fee for Feldman to $50,000, but Kovens and Paul agreed to keep the fee at $25,000.  Kovens Declaration at ¶7, Exhibit A.  Paul also asked Kovens to keep Harvey Grossblatt ("Grossblatt") as an officer of the company after Kovens purchased his shares.  Id.  Paul also asked Kovens to pay Poltarak's legal fees, which Kovens agreed to do.  Id. Kovens mentioned to Paul that the USI stock could be worth $10 a share, but Paul responded that "I wished you a lot of luck, I just want my $2.85."  Kovens Transcript at 87/7-87/11, Exhibit B to Defendant's Motion; Kovens Declaration at ¶7, Exhibit A.  During the meeting Frank overheard a conversation on the speaker phone that Paul had with Taubin, in which Paul asked Taubin to count how many shares of USI stock he owned, and controlled through his family and friends.  Exhibit E at ¶4.  During this conversation, Frank overheard Paul tell Taubin that he was going to sell his USI stock to Kovens.  Id.

On November 15, 2001, at the prior request of Paul, Kovens paid Poltarak's law firm $2,500 for the legal fees that

Paul incurred.  Exhibit F.  Kovens Declaration at ¶8, Exhibit A.  On November 27, 2001, Morgan Stanley wired $25,000 to an escrow account in Poltarak's law firm for the fee to be paid to Feldman.  Exhibit G.

On or about December 20, 2001, Kovens went to New York to pick up the written request for the shareholders meeting that had been signed by Paul and members of his family and friends. Kovens Declaration at ¶9, Exhibit A; Kovens Transcript at 59/12-60/6, Exhibit B to Defendant's Motion.  Kovens called Paul from New York to thank him for signing the papers.  Id. During this conversation Paul told Kovens that "I am only doing that [signing the request for a special shareholders meeting] because you are buying the shares, I want to make sure that you are doing that."  Kovens Transcript at 59/23-59/25, Exhibit B to Defendant's Motion; Kovens Declaration at ¶9, Exhibit A.  Kovens assured Paul that the deal would go forward, that the money was at Morgan Stanley and that he had given Taubin permission to discuss the escrow account with Paul at any time.  Kovens Declaration at ¶9, Exhibit A; Kovens Transcript at 59/25-60/4, Exhibit B to Defendant's Motion.

On or about December 24, 2001, the law firm Miles & Stockbridge, on behalf of Kovens and the other "Reporting Persons" identified in the Schedule, filed a Schedule 13-D

with the Securities and Exchange Commission ("SEC").  Exhibit
A to Defendant's Motion.  This document was prepared by Miles
& Stockbridge, and was filed electronically with the SEC.
Exhibit A to Defendant's Motion; Kovens Declaration at ¶10,
Exhibit A.  It contains language, relied upon by Paul in his
Motion, that "no Reporting Person has any contracts . . . with
any person with respect to the securities issued by the
Company [USI]."  Exhibit A to Defendant's Motion at 11.
Kovens does not recall that language in the document at the
time he signed the Schedule.  Kovens Transcript at 72/7-72/8,
Exhibit B to Defendant's Motion.  Kovens Declaration at ¶10,
Exhibit A.

On December 24, 2001, Grossblatt was served with a copy
of the request for a special meeting of the shareholders.
Exhibit H.  This request was signed by Paul, and members of
his family and friends.  Id. at 4-6.

On or about January 8, 2002, Feldman informed Kovens that
Paul had changed his mind and was not going to sell his shares
of USI stock to Kovens.  Kovens Declaration at ¶11, Exhibit A;
Complaint at ¶24.  Sometime thereafter in January 2001, Paul
told Kovens that he was not going to sell his shares to
Kovens, and that the deal was off.  Kovens Declaration at ¶11,
Exhibit A; Kovens Transcript 53/20-54/5, Exhibit B to

Defendant's Motion.  On January 28, 2002, Paul withdrew his request for a special meeting of the shareholders.  Exhibit I.

### ARGUMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides for summary judgment to be granted, the moving party must show that "there is no genuine dispute as to any material fact, and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  As stated by the United States Court of Appeals for the Second Circuit, summary judgment is a "**drastic device**," wherein "the moving party bears a **heavy burden** of demonstrating the absence of any material issues of fact."  Nationwide Ins. Co. v. Bankers Leasing Ass'n, Inc., 182 F.3d 157, 160 (2d Cir. 1999) (emphasis supplied) (quoting Eastway Constr. Corp. v. City of New York, 762 F.2d 243, 249 (2d Cir. 1985), cert. denied, 484 U.S. 918 (1987).  Under this standard, in reviewing a motion for summary judgment "a district court must resolve all ambiguities and draw all reasonable inferences in favor of the party defending the motion."  Id.  In this regard, "if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper."  St. Pierre v. Dryer,

11

208 F.3d 394, 404 (2d Cir. 2000); Brady v. Town of Colchester, 863 F.2d 205, 211 (2d Cir. 1988).

## I.   PAUL IS NOT ENTITLED TO SUMMARY JUDGMENT ON GROUNDS THAT THE TERMS OF THE ALLEGED CONTRACT ARE INDEFINITE.

It is well settled in the Second Circuit that "[s]ummary judgment is only proper in contract disputes if the contract language is wholly unambiguous." Mellon Bank, N.A. v. United Bank Corp. of New York, 31 F.3d 113, 115 (2d Cir. 1994) (citing Wards Co. Inc., v. Stamford Ridgeway Assoc., 761 F.2d 117, 120 (2d Cir. 1985) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1320 (2d Cir. 1975); Sayers v. Rochester Telephone Corp. Supplemental Management Pension Plan, 7 F.3d 1091, 1094 (2d Cir. 1993) ("In a contract dispute a motion for summary judgment may be granted only where the agreement's language is unambiguous and conveys a definite meaning."); Broadway Nat. Bank v. Progessive Cas. Ins. Co., 775 F.Supp. 123, 126 (S.D.N.Y. 1991), aff'd, 963 F.2d 1522 (2d Cir. 1991) ("In contract actions, summary judgment is appropriate only where language of relevant agreement is unambiguous."). Moreover, under New York law, striking down a contract as "indefinite and in essence meaningless, 'is at best a last resort.'" 166 Mamaroneck Ave. Corp. v. 151 East Post Road Corp., 78 N.Y.S.2d 88, 575 N.E.2d 104, 571 N.Y.S.2d 686, 688

(1991) (quoting Heyman Cohen & Sons v. Lurie Woolen Co., 232
N.Y. 112, 114, 133 N.E. 379 (1921)).  The court must find that
the contract is so indefinite that it reaches "the point where
construction becomes futile."  Don King Productions v. Douglas,
742 F.Supp. 741, 762 (S.D.N.Y. 1990) (quoting New York case
law).  Accordingly, in an action for breach of contract, "the
Second Circuit has made clear, 'the issue of whether (and when)
the parties intended to be bound is factual issue that should
[be] submitted to the jury.'"  Michael Coppel Promotions Pty.
Ltd. v. Bolton, 982 F.Supp. 950, 953 (S.D.N.Y. 1997) (quoting
International Minerals & Resources, S.A. v. Pappas, 96 F.3d
586, 593 (2d Cir. 1996)).

      In this case there is evidence that Kovens and Paul agreed
to the essential terms of the alleged contract.  As set forth
in the Kovens Declaration and the transcript of the Kovens
deposition, there was an agreement as to the price of the
shares, $2.85 per share, the number of shares to be purchased,
171,000, and the manner and time of performance, i.e., payment
from the escrow account at Morgan Stanley to Paul after the
special meeting of shareholders was held, or until such time
that a special meeting the meeting could not be held.  See

13

Kovens Declaration at ¶¶5 and 7, Exhibit A, and Kovens

Transcript at 77, Exhibit B to Defendant's Motion.[1]

There is also evidence that Paul confirmed his agreement

in two subsequent conversations with Kovens.  In his

Declaration and in his deposition testimony, Kovens states that

during the November 2, 2001 meeting in New York and in his

phone call with Paul on or about December 20, 2001, Paul

confirmed that there was an agreement.  Kovens Declaration at

¶¶7 and 9, Exhibit A; Kovens Transcript at 87/7-87/11 and

59/20-59/25, Exhibit B, attached to Defendant's Motion.

The existence of the agreement is also confirmed in both

the Frank Declaration and the Taubin deposition testimony.  In

his Declaration, Frank states that in late October 2001, Kovens

─────────────────────

[1]   The assertion by Paul that the Court should not believe
Kovens testimony in its entirety, is not supported by the case
law Paul relies upon.  The cases are inapposite because none
of them were in the context of a motion for summary judgment,
but rather all of them were based upon the court's
consideration of all the evidence after a trial or evidentiary
hearing.  See Bottalico v. City of New York, 281 App. Div.
339, 119 N.Y.S.2d 704, 706 (1st Dept. 1953) (testimony during
jury trial); DeMayo v. Yates Realty Corp., 35 A.D.2d 700, 702,
314 N.Y.S.2d 918 (1st Dept. 1970) (testimony during bench
trial); Matter of Allen v. Black, 275 A.D.2d 207, 712 N.Y.S.2d
487 (1st Dept. 2000) (testimony during evidentiary hearing on
domestic dispute).  By contrast here, in considering a motion
for summary judgment the Court does not weigh the credibility
of the witnesses, but rather all ambiguities and reasonable
inferences from the evidence submitted are made in favor of
the party defending the motion.  Bankers Leasing Ass'n, Inc.,
182 F.3d at 160; Eastway Constr., 762 F.2d at 249.

told him that he had a agreement with Paul "to purchase the shares of stock owned by Paul and members of his family and friends, in Universal Security Instruments, Inc. ("USI") at the price of $2.85 per share." Exhibit E at ¶3. Frank also states that during the meeting on November 2, 2001, he overheard a conversation on the speaker phone that Paul had with Taubin, in which Paul told Taubin that he was going to sell his shares of USI stock to Kovens. Id. at ¶4.

In his deposition testimony, quoted at length above, Taubin, Paul's stockbroker, confirmed that there was an agreement. Taubin testified that, prior to the wire transfers on October 30 through November 1, 2001, he learned from Paul that Paul and Kovens had entered into a deal where Paul was going to sell his stock to Kovens at a specific price per share. Exhibit C at 10/2-11/16 and 28/7-28/24.

Moreover, the documents are circumstantial evidence that there was a contract. The account statements from Morgan Stanley show that Kovens wired $512,500 into the escrow account, from which $25,000 was transferred to Feldman. Exhibit D at 00167 (deposits as of 11/1/01 total $512,500.98). What is significant in this regard is the amount of the wire transfer, $512,500. If there was no deal why would Kovens transfer the precise amount of $2.85 per share times the number

15

of shares owned and controlled by Paul 171,000, plus $25,000 to pay Feldman, plus wire transfer fees, into an escrow account maintained at the offices of Paul's stockbroker.

In addition to the account statements, the check in the amount of $2,500 was received and cashed by Poltarak, Paul's attorney.  Exhibit F.  The December 24, 2001 letter requesting a special meeting of the shareholders of USI was signed by Paul, and the members of his family and friends.  Exhibit H at 4-6.  It behooves logic to suggest, as Paul apparently does, that he signed the request for a special meeting of the shareholders merely as an accommodation to Feldman.  At the very least, if all reasonable inferences are made in favor of Kovens, as they must at this stage of the proceeding, the fact that Paul signed the request is evidence of partial performance by Paul, which, under New York law, is significant evidence that there was an agreement.  Dimario v. Coppola, 10 F.Supp.2d 213, 220 (E.D.N.Y. 1998) ("Partial performance under New York law and general contract principles is a significant factor in determining not only the existence of a binding oral agreement but in constructing terms.").

In his Motion, Paul does not even address any of the foregoing evidence.  Instead, Paul attempts to argue that because  the settlement did not go forward on November 2, 2001

16

there can be no contract.  Paul also argues that the contract
is contracted by the Schedule 13-D filed by Miles &
Stockbridge.  As explained below, neither of these arguments
are sufficient to entitle Paul to summary judgment on grounds
that the alleged contract is indefinite as a matter of law.

### A. Paul Is Not Entitled To Summary Judgment Because He      Asserts That The Time Of Performance Was Indefinite.

In his attempt to create an indefinite contract, Paul
misinterprets both the allegation in the Complaint and the
testimony by Kovens in his deposition about the settlement.
The Complaint does not allege[2] that settlement had to occur on
November 2, 2001.  Instead, the Complaint alleges that "[t]he
date for settlement was **scheduled for** November 2, 2001."
Complaint at ¶12 (emphasis supplied).  This allegation is
entirely consistent with facts as they evolved in this case.
The settlement was scheduled to take place on November 2, 2001,
but was then deferred until after the special meeting of
shareholders was held, or until such time that a special
meeting could not be held, a procedure that Paul agreed to.

---

[2]  As such, the case law cited by Paul that a factual
allegation in a complaint constitutes a judicial admission is
irrelevant.  The precise factual allegation in the Complaint
is accurate.

Kovens Declaration at ¶5, Exhibit A;  Frank Declaration at ¶3, Exhibit C.

Moreover, in his deposition Kovens did not testify that he "refused to purchase Paul's stock," or "that on the alleged closing date he and his attorneys refused to close," as stated by Paul in his Motion.  Defendant's Motion at 4 and 7. Instead, what he actually said was "[w]e were going to delay the closing till after a special meeting, or an attempt to have a special meeting."  Kovens Transcript at 43/21-43/23, Exhibit B to Defendant's Motion.  He also explained that at the November 2, 2001 meeting "we said it could take a few months to have this special meeting.  We went over the by-laws of the company, we went over the, what is the norm for a special meeting and used those dates."  <u>Id</u>. at 48/18-48/22.  When he was asked during his deposition when Paul was supposed to get his money Kovens replied "immediately after the special meeting."  <u>Id</u>. at 87/25-88/2.  The transcript reads:

Q  When was Mr. Paul supposed to get the money?

A  After the special meeting.

Q  How long after the special meeting?  A day, a year?

A  Immediately after the special meeting, and if the special meeting could not occur, then I was buying it anyway.

18

        Q   When were you going to buy it anyway?

        A   As soon as we would [sic], if we weren't having
the
        special meeting, it would be immediate.

<u>Id</u>. at 87/20-88/8.  The foregoing portion of the transcript was

conveniently ignored by Paul in his Motion, and, even standing

by itself is sufficient evidence to deny summary judgment.

<u>St. Pierre</u>, 208 F.3d at 404 ("if there is any evidence in the

record from any source from which a reasonable inference could

be drawn in favor of the nonmoving party, summary judgment is

improper").

        Furthermore, even assuming *arguendo* that the parties never

actually agreed to a time of performance (when they actually

did), then Paul is still not entitled to summary judgment.

Under New York law, "[e]ven in the absence of a material term

there may still be a binding contract."  <u>Dimario</u>, 10 F.Supp.2d

at 219.  "When the parties fail to state an essential term

clearly or omit such a term, courts will attempt to ascertain

the intent of the parties and enforce the contract."  <u>Gonzalez</u>

<u>v. Don King Productions, Inc.</u>, 17 F.Supp.2d 313, 315 (S.D.N.Y.

1998) (<u>see</u> case law cited therein at 314 n.1).  In the

circumstance where the time of performance is unclear, the

court will imply a reasonable time of performance.  <u>See Data</u>

<u>Consultants, Inc. v. Traywick</u>, 593 F.Supp. 447, 456 (D.Md.

19

1983), <u>aff'd</u>, 742 F.2d 1448 (4th Cir. 1984) (where stockholder's stock purchase agreement did not include specific time for purchase in the event of party's employment termination, it was merely necessary that other party exercise his contractual right with reasonable time); <u>Smith Barney, Harris Upham & Co. Inc. v. Liechtensteinische Landesbank</u>, 866 F.Supp. 114, 117 (S.D.N.Y. 1994) ("Under New York law, where a contract is silent regarding time of performance, duty to perform within reasonable time is implied, unless the parties have specifically 'negotiated over and rejected that particular contract term.'") (<u>quoting</u> <u>Enzo Biochem, Inc. v. Johnson & Johnson</u>, 1992 WL 309613, at *6 (S.D.N.Y. 1992); (<u>General Electric Capital Corp. v. Direc Tv, Inc.</u>, 94 F.Supp.2d 190, 198 (D.Conn. 1990) (when "a contract is silent with respect to time, the Court will infer a reasonableness term"); <u>Metro-Goldwyn-Mayer, Inc. v. Scheider</u>, 40 N.Y.2d 1069, 1070-1071, 392 N.Y.S.2d 252, 360 N.E.2d 930 (1976) (after a bench trial, the court found that the parties had entered into an oral contract for appellant to be principal actor in pilot film and television series even though there was no agreed upon term as to what the starting date was for filming the television

series).[3]  Certainly under the facts of this case, a reasonable time for the closing to take place would have been until after the special meeting of shareholders was held, or until such time that a special meeting could not be held, which as Kovens testified, would only have been a few months.  Kovens transcript at 48/18-48/22, Exhibit B to Defendant's Motion.

### B.  Paul Is Not Entitled To Summary Judgment On Grounds That The 13-D Does Not Mention the Contract.

As a preliminary matter, the case law on judicial estoppel cited by Paul does not apply.  This doctrine, referred to by the New York state courts as "the doctrine of estoppel against inconsistent positions," applies only when a party takes a position in a legal proceeding, and succeeds in maintaining that position, and then attempts to take an inconsistent position in a subsequent legal proceedings.  As explained by the Court in Environmental Concern, Inc. v. Larchwood Construction Corp., 101 A.D.2d 591, 593, 476 N.Y.S.2d 175 (1984), cited by Paul:

> In short, "where a party assumes a certain position in a **legal proceeding** and, succeeds in maintaining that

---

[3]  Considering the foregoing authority, the statement by Paul in his Motion that "[w]hen some terms are left out of a purported agreement, particularly an oral agreement, or even a written agreement, the purported agreement cannot be enforced," is not an accurate statement of law.  Defendant's Motion at 4.

position, he may not thereafter, simply because his
interests have changed, assume a contrary position."

Emphasis supplied (quoting Davis v. Wakelee, 156 U.S. 680, 689
(1895); see also Malamut v. Sassower, 171 A.D.2d 780, 567
N.Y.S.2d 499 (1991) (cited by Paul) (the Court held that the
doctrine of estoppel against inconsistent positions did not
apply where defendant challenged the validity of a retainer
agreement with a law firm in a subsequent action for nonpayment
of attorneys' fees, after defendant as a plaintiff in a prior
domestic action requested an award of attorneys' fees pursuant
to the retainer agreement).  As such, the doctrine of estoppel
against inconsistent positions does not apply here because the
13-D was not filed in any prior legal proceeding.  It was only
filed as an administrative filing with the SEC.  Also, it was
not successfully maintained in any prior proceeding (legal,
administrative or otherwise).  The SEC has taken no action
concerning the 13-D, and there has been no prior adjudication
whatsoever on anything to do with the 13-D.

Moreover, as Kovens explained in his deposition he did not
recall that the above quoted language was in the document at
the time he signed it.  Kovens Transcript at 72/7-72/8, Exhibit
B to Defendant's Motion.  He testified that "I signed what the
attorneys prepared," and explained "I knowingly do not sign
anything false."  Id. at 72/8-72/13.  In this regard is it

22

undisputed that the 13-D was prepared and filed electronically by Miles & Stockbridge.  Exhibit A to Defendant's Motion; Kovens Declaration at ¶9, Exhibit.  As such, Kovens is entitled to a reasonable inference that he was entitled to rely on the work product of his attorneys, and did not knowingly make any false statement.

As such, at best for Paul, the statement in the 13-D that "no Reporting Person has any contracts. . . with any person with respect to the securities issued by the Company," may constitute a prior inconsistent statement by Kovens.  The document could be used on cross-examination to impeach Kovens' testimony that there is a binding contract.  For purposes of summary judgment however, it merely shows that there is a material fact in dispute, which obviously does not entitle Paul to summary judgment.  See Derby & Co. v. Seaview Petroleum Co., 756 F.Supp. 868, 877 (E.D.Pa. 1991) (where prior inconsistent statements are being introduced as admissions in subsequent law suit, party against whom admissions are offered on motion for summary judgment should be allowed full and fair opportunity to demonstrate existence of any issue of material fact).

Furthermore, a Schedule 13-D is an administrative filing with the SEC, intended to provide information for investors in the market place to buy, sell or hold stock.  As such, the

purpose of a Schedule 13-D, and the disclosure rules of the SEC, is to provide investors with notice of a possible change in management or the direction of a business as it "may affect their judgment as to whether the stock should be sold, bought or held."  Marshall Field & Co. v. Icahn, 537 F.Supp. 413, 416 (S.D.N.Y. 1982); accord GAF Corp. v. Milstein, 453 F.2d 709, 717 (2d Cir. 1971), cert. denied, 406 U.S. 910 (1972).  As stated by the United States Supreme Court:

> The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party. By requiring disclosure of information to the target corporation as well as the [SEC], Congress intended to do no more than give incumbent management an opportunity to express and explain its position.  The Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts.  Indeed, the Act's draftsmen commented upon the "extreme care" which was taken "to avoid tipping the balance of regulation either in favor of management or in favor of the persons making the takeover bid."

Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 58-59 (1975) (quoting S. Rep. No. 550, 90th Cong., 1st Sess., 3 (1967)).

Considering the foregoing, under no circumstance could Paul, assuming he is an investor in the market place, be harmed by the statement in the Schedule 13-D prepared and filed by Miles & Stockbridge, that there were no contracts.  Paul had

24

the information that there was an agreement, and such cannot complain that he is entitled to any remedy based on what he now asserts is an inaccurate disclosure.  See Missouri Portland v. H.K. Porter Company, Inc., 535 F.2d 388, 396 (8th Cir. 1976) (it was not reasonably probable that shareholders of Missouri had been misled by disclosures in defendant company's tender offer where Missouri itself had mailed letter to shareholders informing them that defendant sought to gain control of the company and recommended that they reject the tender offer).

Finally, any failure of disclose in the Schedule 13-D filed by Miles & Stockbridge is *de minimus* .  Aside from the fact that Paul already knew about the agreement, the Schedule 13-D did alert investors that Kovens, Paul and the Reporting Persons were requesting a special meeting of shareholders with the purpose:

> (1) to remove all of the Directors of the Company who are in office at the date and time of the special meeting and (2) to elect three Directors to serve until the next annual meeting of stockholders and until the next annual meeting of stockholders and until their successors have been elected and have qualified.

Exhibit A to Defendant's Motion at 9.  Accordingly, investors were given notice of a possible change in management or the direction of USI (regardless of whether or not Paul sold his stock to Kovens).

25

## II.   The Paul Declaration Does Not Establish That
There Are No Material Facts In Dispute.

The Declaration submitted by Paul does not demonstrate that there are no material facts in dispute.  As set forth above, it is contradicted by Kovens' Declaration, Kovens' deposition testimony, the Frank Declaration and Taubin's deposition testimony.  It is also belied by the documents, including the request for a special meeting of shareholders, which is evidence of partial performance by Paul.

It is also contradicted by Paul's own deposition testimony,[4] which in turn is contradicted by the testimony of his attorney, Poltarak.  For instance, in his Declaration Paul recites his version of the November 2, 2001 meeting.  Paul Declaration at ¶¶4 and 5, attached to Defendant's Motion.  By contrast, in his deposition he testified that "I don't remember

_____

[4]  A party's affidavit which contradicts prior deposition testimony should be disregarded on a motion for summary judgment.  Shepard v. Frontier Communications Services, Inc., 92 F.Supp.2d 279, 290 (S.D.N.Y. 2000) ("It is well settled in the Second Circuit that a party's affidavit which contradicts her own prior deposition testimony should be disregarded on motion for summary judgment"); Frederick v. TPG Hospital, Inc., 56 F.Supp.2d 76, 79 n.4 (D.D.C. 1999) ("[t]o the extent that deposition testimony is inconsistent with later-filed affidavit, deposition testimony controls on motion for summary judgment"); Reetz v. Jackson, 176 F.R.D. 412, 414-15 (D.D.C. 1997) (same).

what was said at the meeting, but the nature of it was that Mr. Kovens wasted my time at this meeting in New York." Paul Transcript at 33/20-33/23, Exhibit B.  He further stated that the meeting was "not very long, probably an hour or less or somewhere around an hour," and that the only thing he said at the meeting was "[t[hat I was pissed off," and that "I was leaving the meeting." Id. at 33/9-33/17.  When he was asked "why Kovens would come all the way to New York just to say I don't want to talk about it [the sale of the stock], he testified "[b]ecause he [Kovens] is a fucking idiot." Id. at 36/21-36/23.

   In contrast to Paul's deposition testimony, his lawyer, Poltarak testifed that the meeting lasted about three and a half hours, that Paul was present for the entire meeting, and that Paul did not express any anger at the meeting.  Transcript of William Poltarak Deposition at 14/13-14/17, 15-24-16/6, 17/4-17/9, 36/16-37/8, Exhibit J.

   Finally, the statements by Paul in his Declaration that "[n]o rational agreement could possibly be reached," that "it is astonishing to me that Kovens brought this frivolous law suit," and his personal characterization of the evidence are only statements of conclusory facts or subjective intent, and are not entitled to any weight for purposes of summary

judgment.  <u>Wahad v. F.B.I.</u>, 179 F.R.D. 429, 435 (S.D.N.Y. 1998) (affidavit containing ultimate or conclusory facts and conclusions of law cannot be used in connection with summary judgment motion); <u>see also</u> <u>Kenyon v. Delman</u>, 38 F.Supp.2d 107, 110 (N.D.N.Y. 1998), <u>aff'd</u>, 198 F.3d 233 (2$^d$ Cir. 1999) (in determining whether the parties entered into a contract "the Court does not look to the subjective intent of the parties but the intent that is evident from their objective actions and statements"); <u>accord</u> <u>Lehrer McGovern Bovis, Inc. v. New York Yankees</u>, 207 A.D.2d 256, 259, 615 N.Y.S.2d 31, 34 (N.Y.App.Div. 1994).

WHEREFORE, for the foregoing reasons, Plaintiff Michael L. Kovens respectfully requests that the Motion for Summary Judgment filed by Defendant Bruce H. Paul be denied.

Respectfully submitted,

COOTER, MANGOLD, TOMPERT & WAYSON, L.L.P.

_____/s/_____
Dale A. Cooter, Esq., #01743
James E. Tompert, Esq., #03063
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C. 20015
(202)537-0700

*Attorneys Plaintiff*

28

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of January 2005, a copy of the foregoing Memorandum of Law and Exhibits was served electronically, and by overnight delivery, on:

David Jaroslawicz, Esq.
Jaroslawicz & Jaros
150 William Street
New York, New York 10038

/s/
_____
James E. Tompert