**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____

MICHAEL L. KOVENS,       )
                           )
         Plaintiff,     )
                           )
    v.                 )  C. A. No. 1:04 Civ. 2238 (TPG)
                           )
BRUCE H. PAUL,         )
                           )
        Defendant.   )
_____)

## PLAINTIFF'S BRIEF REGARDING DAMAGES

At the conclusion of the liability phase of the trial, the Court requested briefing on the issue of damages.[1]  Plaintiff Michael L. Kovens ("Kovens"), by and through his counsel, hereby submits his Brief regarding damages and states as follows:

**I.**     **THERE ARE CASES OFFERING DIRECT SUPPORT FOR KOVENS' THEORY THAT HIS DAMAGES SHOULD BE CALCULATED AS OF THE TRIAL**

The primary issue on damages is whether Plaintiff's damages should be calculated as of the date of breach (January 28, 2002), or the time of trial.  Plaintiff submits, as set forth in the discussions below, that several principles (e.g., flexibility of damages, making the plaintiff whole) support Plaintiff's position that damages should be determined as of the time of trial and, alternatively, that even if damages are calculated as of the date of breach, the value of the shares at both points in time is the same.  In addition to these principles, however,  Plaintiff has also found three cases, including one New

_____

[1]  With all due respect to the Court, Kovens continues to object to the Court's ruling that it, rather than the jury, will decide the amount of damages in this case.  Kovens has a Seventh Amendment right to have a jury determine the amount of his damages.

York case, directly supporting his position that his damages should be calculated as of the date of verdict: <u>Bamira v. Greenberg</u>, 295 A.D.2d 206, 744 N.Y.S.2d 367 (2002); <u>Mercantile Holdings, Inc. v. Keeshin</u>, 261 Ill. App.3d 546, 633 N.E.2d 805, 199 Ill. Dec. 9 (1993);and <u>American National Bank and Trust Company of Chicago v. Erickson</u>, 115 Ill. App. 3d 1026, 452 N.E.2d 3, 72 Ill. Dec. 71 (1983).[2]

In <u>Bamira</u>, the plaintiff brought an action alleging both breach of contract and breach of fiduciary duty arising out of the defendant's misappropriation of a partnership opportunity to purchase a company's stock.  295 A.D.2d at 206, 744 N.Y.S.2d at 368.  The plaintiff sought damages equal to the value of the stock on the date of the verdict, as well as prejudgment interest.  <u>Id</u>.  The court vacated the interest award, but affirmed the award based on the date of verdict stock value, finding that the plaintiff had been made whole  "[b]y the jury's award of damages based on the present value of stock that had significantly appreciated during the period between defendant's misappropriation of the partnership opportunity and the verdict."  295 A.D.2d at 207, 744 N.Y.S.2d at 369.  The judge had correctly instructed the jury that its verdict should "make plaintiff whole by putting him 'in the same position he would have been had [defendant] complied with his contractual obligations,' and the jury presumably followed the court's instruction." 295 A.D.2d at 207, 744 N.Y.S.2d at 369.

---

[2] Defendant, in his Motion in Limine and at trial, offered no damage theory alternative to Plaintiff's and instead advocates a per se rule which in all circumstances excludes the type of evidence Plaintiff seeks to use to support his request for damages. The cases Plaintiff relies on, both in this Brief and in his Opposition to Defendant's Motion in Limine, conclusively demonstrate ***the absence*** of a per se rule which would exclude Plaintiff's theory of damages and his evidence.  Therefore, Plaintiff's damages cannot be excluded as a matter of law and the calculation is appropriately left to a jury for resolution.

In <u>Mercantile Holdings, Inc. v. Keeshin</u>, defendant breached an assignment agreement, resulting in the loss of stock which had secured a loan.  The agreement was breached on October 19, 1978.  261 Ill. App.3d at 549, 633 N.E.2d at 807, 199 Ill. Dec. at 11.   The appellate court agreed with the trial court's ruling that "the proper measure of damages is the highest value of the stock between the date of the breach and the date that the judgment was entered . . . ."  <u>Id</u>.

In <u>American National v. Erickson</u>, the plaintiffs loaned shares of stock to the defendant for a two year period.  115 Ill. App. 3d at 1027-28, 452 N.E.2d at 5, 72 Ill. Dec. at 73.  At the end of that period, the defendant failed to return the share certificates to the plaintiffs. 115 Ill. App. 3d at 1028, 452 N.E.2d at 5, 72 Ill. Dec. at 73.  The agreement was then modified, by defendant agreeing to repay the loaned shares and to transfer to plaintiffs the outstanding stock of another company.  <u>Id</u>.  In 1974, some of the original shares were repaid, but there was still a balance remaining.  Plaintiffs sued and the court granted their motion for summary judgment in July 1981, awarding to plaintiffs damages based on the number of shares which were due to plaintiffs multiplied by the value of the stock as of the date of the order granting summary judgment.  <u>Id</u>.  On appeal, the defendants argued that the proper measure of damages was the value of the shares of stock on the date defendant breached the agreement.  115 Ill. App. 3d at 1030, 452 N.E.2d at 6, 72 Ill. Dec. at 74.  The appellate court disagreed and affirmed the trial court's damage award:

> The proper measure of damages in a breach of contract action is the amount which will place an injured party in the position he would have been had the contract been performed. [citations omitted].
>
> In the instant case, the trial court awarded plaintiffs a sum representing the value of the loaned shares as of the date which the court entered judgment. A lesser award would have enabled defendants to benefit

> from breaching the agreement. It would also have deprived plaintiffs of the increased value of the shares which they would have received had the agreement been performed. We therefore find that trial court's measure of damages was proper.

Id.

Each of the foregoing cases directly supports Kovens' argument that his damages should be calculated as of trial. Such a valuation is necessary to make Kovens whole. Any other measurement would allow Paul to benefit (which he has admitted he has already done - in the approximate amount of $2,000,000) from breaching the agreement and would deprive Kovens of the true value of the shares he would have received had Paul performed the agreement.

## II.   THE COURT SHOULD APPLY MARYLAND LAW

As explained in Kovens pre-trial brief in opposition to Defendant Bruce H. Paul's ("Paul") Motion in Limine, this case presents a conflicts of law issue which, Kovens submits, should be resolved in favor of the application of Maryland law. Although there are some contacts with New York, such as the fact that Paul resides in New York and there was a meeting in New York attended by both Paul and Kovens regarding the agreement, Maryland law should apply because: (1) USI is a Maryland corporation and Kovens is a Maryland resident; (2) New York, like most states, recognizes the internal affairs doctrine (BBS Norwalk One, Inc. v. Raccolta, Inc., 60 F. Supp.2d 123 (S.D.N.Y.), aff'd, 205 F.3d 1321 (2nd Cir. 2000)) and this doctrine points to the application of Maryland law; and (3) a traditional New York conflicts of law "center of gravity" or "grouping of contacts" approach points to the application of Maryland law. The Mark Andrew of the Palm Beaches, Ltd. v. GMAC Commercial Mortgage Corp., 265 F.Supp.2d 366, 377 (S.D.N.Y. 2003), aff'd, 96 Fed. Appx. 750 (2nd Cir.

2004); <u>Jefferson Insurance Co. Of New York v. Fortress RE, Inc.</u>,616 F.Supp. 874, 877 (S.D.N.Y.

1984); <u>Auten v. Auten</u>, 308 N.Y.155, 124 N.E.2d 99 (1954).  Also, as discussed in Kovens'

opposition to Paul's Motion in Limine, the contract in this case involved the purchase of Paul's stock by

Kovens, and also the request for a special meeting of shareholders.  In addition, Paul's primary defense

in this case was that the attorneys at Miles & Stockbridge filed a Schedule 13-D on behalf of Kovens,

which did not disclose the stock purchase - a 13-D prepared by Maryland attorneys at their office in

Baltimore, Maryland.

The foregoing facts and cases are discussed more fully in Kovens' pre-trial Opposition to the

Motion in Limine, which Opposition is incorporated herein by reference as if fully set forth herein.  In

addition to the facts discussed in that Opposition, however, it is now clear from the trial that Maryland,

rather than New York, law should apply.  The jury was instructed – without objection from Paul – that

the elements of the Kovens-Paul contract included the following three elements: (1) Paul would join

Kovens in calling the special meeting; (2) Paul would vote with Kovens as the special meeting; and (3)

the parties would, in fact, close on Paul's sale to Kovens of Paul's stock.  The inclusion of the special

meeting as an element of the contract further supports the application of Maryland law to this dispute.

The verdict sheet given to the jury is also instructive on the conflict of law issue.  The verdict form itself

reflects the significance of Maryland to the contract because the second question asked whether "Paul

agreed to assist in the calling of a special shareholders' meeting of USI and to close on the sale of

shares after the meeting."  In terms of both the "internal affairs doctrine" and the "center of gravity"/

"grouping of contacts" approach that New York applies to a conflicts of law situation, Question

Number 2 certainly manifests the importance of Maryland to this dispute.

5

III.     THE FLEXIBLE APPROACH TO DAMAGES UNDER MARYLAND LAW
         ALLOWS THE COURT TO VALUE THE STOCK AS OF A DATE AFTER
         BREACH AND CLOSER IN TIME TO TRIAL

Kovens explained in his pre-trial Opposition to Paul's in limine motion that Maryland utilizes a flexible approach to damages which seeks to award a plaintiff his expectation or benefit of the bargain damages and returns the plaintiff to the position he would have been in absent the defendant's breach. See Kovens' Oppos. To Paul's Motion in Limine at 16-17 (citing Munday v. Waste Management of North America, Inc., 997 F.Supp. 681, 685 (D.Md. 1998); Maryland Nat. Bank v. Traenkle, 933 F.Supp. 1280, 1289 (D.Md. 1996), aff'd, 10 Fed.Appx. 194 (4th Cir. 2001); Stone v. Chicago Title Ins. Co. of Maryland, 330 Md. 329, 624 A.2d 496, 562 (1993); Hadley v. Baxendale, 156 Eng.Rep. 145 (1854); St. Paul at Chase Corp. v. Manufacturer's Life Insurance Co., 262 Md. 192, 278 A.2d 12, 35 (1971), cert. denied, 404 U.S. 857 (1971); Hall v. Lovell, 121 Md.App. 1, 708 A.2d 344, 349 (1998), cert. denied, 350 Md. 487, 713 A.2d 980 (1998)).   As demonstrated below, other jurisdictions, like Maryland, also approach damages flexibly to ensure that a plaintiff is fully compensated for his damages. Having established all of the elements of his claim (as demonstrated by the favorable jury verdict on liability), Kovens is entitled to damages which will make him whole:

> The paramount rule in assessing damages is that every person unjustly deprived of his rights should at least be fully compensated for the injury he sustained.  Where articles have a determinate value and are unlimited in production, the general rule is to give their value, at the time the owner was deprived of them, with interest to the time of the verdict. . . . But it is manifest that this would not remunerate him, where the article could not be obtained elsewhere, or where from restrictions on its production, or other causes, its price is necessarily subject to very considerable fluctuations.

* * * *

The case of stock is an exception to the general rule applicable to chattels.  It is made an exception in obedience to the paramount obligation to indemnify the party for his loss.  The rule of convenience gives place to the rule of justice.  The moment we proceed, on this ground, to take it out of the general rule, we are obliged to substitute one that will do complete justice to the party injured.  "The question is, what did the plaintiff lose?" [Citation omitted].  He is entitled to all the advantages he could have derived from the stock, if it had been delivered at the specified time [citation omitted].  Those advantages are the highest market value between the breach and the trial, together with the *bonus* and dividends which have been received in the mean time [citation omitted].  . . . Nothing short of this will do justice, because nothing short of it will give the plaintiff the benefits he could have enjoyed if he had not been deprived of his rights.

Bank of Montgomery County v. Reese, 26 Pa. 143, 1856 WL 7054, *4, *5 (Pa. 1856) (emphasis in original).

Rosensaft v. The Ashton Technology Group, Inc., 1998 WL 101959 (S.D.N.Y. 1998) is a case which the Court brought to the attention of counsel for Kovens and Paul during the trial. Rosensaft examined the appropriate measure of damages recoverable by a seller of stock pursuant to the New York Uniform Commercial Code.  Although the case is inapposite insofar as the plaintiff was the seller of the stock, rather than, as here, the purchaser of the stock, the underlying principal - that a plaintiff should be made whole - is pertinent to the instant case.  In Rosensaft, the defendant buyer argued that plaintiff's resale was not commercially reasonable and therefore damages must be calculated under N.Y.U.C.C. Section 2-708(1).[3]  1998 WL 101959 *2.  According to defendant, the plaintiff's damages were zero because, applying, the per share price on the date that the stock sale was to have closed was over $3.00 per share, which was higher than the contract purchase price of under

---

[3] Under N.Y.U.C.C. Section 2-708(1), "the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages . . . ."

$3.00 per share.  The court did not agree that Section 2-708(1) was applicable, but observed that even if it was, Section 2-708 also provided that if the "'measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance . . .'  Given that no damages would result under subsection (1), subsection (2) would be triggered and Plaintiff would be duly compensated in accordance with the terms of that section."  1998 WL 101959 *2 (quoting N.Y.U.C.C. §2-708(2)).  The <u>Rosencraft</u> case is instructive for the additional reason that in calculating the plaintiff's damages, the Court took into account the fact that the plaintiff could first sell the stock in the open market, in an attempt to mitigate, on a particular date in conformance with Rule 144.  1998 WL 101959 *1.  Here, too, Rule 144 would have governed when, and in what increments, Kovens could have sold the stock he was to have purchased from Paul.

## IV.  PAUL BEARS THE RISK OF UNCERTAINTY IN THE DAMAGES CALCULATION

Whether Maryland law or New York law applies, it is clear that it is Paul who bears the risk of any asserted uncertainty[4] in determining the value of the shares of USI stock which Paul had promised he would sell to Kovens.  <u>Contemporary Mission, Inc. V. Bonded Mailings, Inc.</u>, 671 F.2d 81, 84 (2nd

---

[4]  Although "uncertainty" of damages issues often arise in a lost profits case, this case does not involve a "lost profits" analysis.  The calculation of damages reflected in Stuart Rosenberg's Supplemental Expert Witness Report dated September 28, 2005 ("Supplemental Report") (attached hereto as Exhibit A), and the testimony which he would have given at trial, do not constitute a lost profit analysis.  Declaration of Stuart A. Rosenberg ("Rosenberg Decl.") (attached hereto as Exhibit B) at ¶14.  He did not estimate the future stock price of USI nor did he consider any forward looking evidence in arriving at his opinion regarding damages.  Rosenberg Decl. at ¶14.  The damage to Kovens at the time of the breach can be equated to the present value of the stock based on the actual performance of the market.  Rosenberg Decl. at ¶14.

Cir. 1982);  Madison Pictures, Inc. v. Pictorial Films, Inc., 6 Misc. 2d 302, 335, 151 N.Y.S.2d 95,

127-28 (1956) (wrongdoer bears the risk of uncertainty that his wrong has created); Impala Platinum

Ltd. v. Impala Sales, 389 A.2d 887, 907 ("where a defendant's wrong has caused the difficulty of

proving damage, he cannot complain of the resulting uncertainty") (quoting M&R Builders v. Michael,

215 md. 340, 345-349, 138 A.2d 350 (1958)).  In Biolife Solutions, Inc. v. Endocare, Inc., 838 A.2d

268 (Del. Chancery 2003), the court assigned to the defendant the uncertainty as to when the

registration statement would have become effective and resolved the issue in plaintiff's favor:

> [W]hile acknowledging the degree of uncertainty that characterizes a damage
> calculation for the hypothetical sale of shares that were never registered and never sold
> into the market, the court must measure damages by determining the proceeds [Plaintiff]
> could have received for its shares.  In Duncan[v.TheraTx, Inc., 775 A.2d 1019 (Del.
> 2001)], the Delaware Supreme Court held that the "defendant should bear the risk of
> uncertainty in the share price because the 'defendant's acts prevent a court from
> determining with any degree of certainty what the plaintiff would have done with his
> securities had they been freely alienable.'"

Biolife, 838 A.2d at 284.  As stated by the Court in Blue Cross & Blue Shield of N.J. v. Philip Morris,

36 F. Supp.2d 560, 585 (E.D.N.Y. 1999):

> [O]nce the other elements of a cause of action have been proven, considerable leeway
> and flexibility in establishing damages is permitted.  See e.g., Story Parchment Co. v.
> Paterson Parchment Paper Co., 282 U.s. 555, 562-563, 51 S.Ct. 248, 75 L.Ed. 544
> (1931)("[T]here is a clear distinction between the measure of proof necessary to
> establish the fact that petitioner had sustained some damages and the measure of proof
> necessary to enable the jury to fix the amount . . . . The wrongdoer is not entitled to
> complain that [damages] cannot be measured with the exactness and precision that
> would be possible if the case, which he alone is responsible for making, were
> otherwise.") .

36 F. Supp.2d at 585 (also citing United States Football League v. National Football League, 842

F.2d 1335, 1379 (2nd Cir. 1988)).  Here, the jury's verdict on liability establishes that there is no doubt

that Kovens has proven all the elements of his cause of action.  Accordingly, Kovens should be

afforded "leeway and flexibility" in proving his damages.

## V.      A DAMAGES AWARD IN CONFORMANCE WITH KOVENS' EXPERT'S CALCULATIONS WILL MAKE KOVENS WHOLE

### A.      Kovens Is Entitled to Recover the Value of the Stock Paul Agreed to Sell to Kovens

Giving due consideration to Maryland's flexible approach to damages, the principle that any

uncertainties in a damages calculation must be borne by defendant, and the doctrine that a damages

award should be fashioned so as to make a plaintiff whole, Kovens submits that his expert's valuation is

an appropriate measure of damages in this case.  The current stock price of USI stock is the natural

and proximate consequence of the breach, which was reasonably within the parties' contemplation at

the time of contracting.  This Court was correct to be concerned that at the time of breach the USI

stock was only thinly traded.  The particular circumstances of this case - to include the fact that the

stock was thinly traded in 2001 and 2002 - underscores the importance of a flexible approach to

damages. It would be unfair to value the stock at the price at it was trading on the day of breach

because the stock was thinly traded at that time and because to do so would not be compensating

Kovens for the real value of the stock:

> We undertake to say that had the preferred stocks been listed on some exchange, and
> if there were active day-by-day trading in the said stocks, with high and lows, there
> might be established perhaps a different fair market value than the mean of the high and
> low on the day that the merger took effect.  This would be especially true if there is
> what is called a lean market, a "Bull" or a "Bear" market . . . .  Nonetheless, such
> market as was or had been, or immediately would be available should furnish, at least
> some evidence of the market value on the merger date.

> We all know that "the market" is enigmatic. . . . [N]o one or one group, especially a court or a jury safely can rely upon the market alone to determine the fair market value of a particular security on any given day. . . . In the instant case, we conclude that the market in the securities, which are the subject of this inquiry was "too thin" and purchases and sales, as shown by the evidence, were not sufficiently close to the date of the merger, to do any more than furnish evidence for consideration by the jury in arriving at the fair market value of the preferred stock in question on the merger date.

General Grain, Inc. v. Goodrich, 140 Ind. App. 100, 110-12, 221 N.E.2d 696, 701-02 (1967).

Because the USI stock was traded for part of the period only over-the-counter, the price at which the shares were trading is not conclusive. Dynamics Corp. Of America v. Abraham & Co., 5 Misc.2d 652, 166 N.Y.S.2d 128 (1956). "Where stock is traded over-the-counter, "the alleged market price, for which the only recorded transactions are in the form of bid and asked prices, is not a controlling consideration [citation omitted]. Even as to those stocks which are listed on an established exchange, market value is not the sole criterion, though concededly of significant importance." 5 Misc.2d at 653, 166 N.Y.S.2d at 130; Falls v. Fickling, 621 F.2d 1362,1369(5th Cir. 1980)(a stock's price on the public market does not conclusively establish its fair market value); cf. Amodio v. Amodio, 70 N.Y.2d 5, 7, 509 N.E.2d 936, 936, 516 N.Y.S.2d 923, 923 (1987) ( "[t]here is no uniform rule for valuing stock in closely held corporations. 'One tailored to the particular case must be found, and that can be done only after a discriminating consideration of all information bearing upon an enlightened prediction of the future'") (quoting Snyder's Estate v. United States, 285 F.2d 857, 861 (4th Cir. 1961)).  Here, too, value must be given to the fact that Paul's block of shares would have provided Kovens with a controlling block of stock. Estate of Godley v. Commissioner of Internal Revenue, 286 F.3d 210 (2002) (factfinder must look at all the facts in determining value of stock, and an increase in value is appropriate where control block is involved). Id. at 214.

Although it is an options case, the valuation discussion in Greene v. Safeway Stores, Inc., 210 F.3d 1237 (10th Cir. 2000) bears consideration. Greene is an employment discrimination and the damages issue involved the proper measure of the value of plaintiff's stock options which were part of plaintiff's compensation package. At the time plaintiff was fired in 1993, about half of his options had vested. 210 F.3d at 1243. Plaintiff's subscription agreement required plaintiff to exercise the vested options within a ninety-five day period after his termination, which he did (in December 1993). Id. at 1243. Plaintiff testified that had he not been fired, he would not have exercised his stock options until after November 7, 1995, the date he would turn 55. Id. Plaintiff's damages expert testified that if plaintiff had waited until January 1996 to exercise his options (more than two years after the date he did exercise them), he would have "reaped the benefit of increase in the market price" of the stock for "an incremental gain of $3,000,000." Id. Having noted that the "value of an option is inherently fluid because it equals the difference in the exercise price and the market price," id. at 1243, the Greene Court rejected the defendant's contention that the unrealized stock option appreciation was a consequential damage because defendant could not control the market price and because plaintiff sold his stock a short time after exercising his options:

> The value of [plaintiff's right to buy shares at a prefixed price] went up and down with the market price of the stock. In forcing [plaintiff] to exercise the options earlier than he otherwise would have, [defendant] curtailed [plaintiff's] right to choose the date on which he would exercise his right to buy stock in order to maximize his profit on the sale of the shares acquired.

Id. at 1244. Here, the evidence demonstrated that Kovens would not have immediately sold the shares he was to have purchased from Paul: Kovens was subject to Rule 144 restrictions and he did not want to sell immediately because he wanted to gain control of and exercise control over USI. By breaching

13

his agreement with Kovens, Paul curtailed Kovens right to make any investment or control decisions relative to the shares.

### B.   The Trial Evidence Supports a Damages Award in Kovens' Favor in the Amount Stated in Rosenberg's Damages Report

In applying the foregoing principles to the damages calculation, the Court now has the benefit of actual trial evidence - both by way of witness testimony and admitted exhibits.  Paul testified, for instance, that he has now sold virtually all of his USI shares at a substantial gain - approximately $2,000,000.  He also testified that he sold some shares as high as $19 per share – far in excess of the price of $2.85 per share which is the highest value he will concede to for purposes of the damages calculation.  Moreover, Paul's Trial Exhibit I, admitted into evidence, states that as of September 28, 2005, USI stock was trading at $18.17 per share.

As explained in Kovens' Opposition to the in limine motion, the expectation that Kovens would hold onto the Paul stock for some period of time after purchase was reasonable because (1) Rule 144 (17 C.F.R. 230.144, et seq. (2005)) would have significantly restricted how many shares of stock Kovens could sell in any given period; (2) Paul understood that, after the acquisition of the shares by Kovens, Kovens would own a majority of the USI stock, and would use this majority interest to regain control of USI and direct the business of the company; and (3) Paul also understood that Kovens would be able to benefit from any increase in USI share price during the period of time he held the stock. Accordingly, the current value of USI's stock is the measure of damages which would place Kovens "in the same position as if the contract had been performed," under Maryland case law.  Munday, 997 F.Supp. at 685; Hall, 708 A.2d at 349.  Such "expectation interest damages" would compensate

14

Kovens for the benefit of his bargain, which was to be able to purchase the shares and hold them for an extended period of time to enable him to effectuate his plan to regain control of USI and direct the business of the company.  Hall, 708 A.2d at 350.

The value of the stock in USI is not strictly co-extensive with the price at which the stock trades on any given day; the "value" of Paul's USI stock was the same on the date of breach (on or about January 28, 2002) and September 28, 2005; the value of Paul's USI stock is $3,655,410.  See Rosenberg Decl. at ¶8.  In addition to the listed price, the value of the stock in this case is measured from the fact that Paul was selling Kovens a control block of stock and that the stock was thinly traded on the over-the- counter market in January 2002.  Rosenberg Decl. at ¶10.  In fact, on certain dates in January 2002, the stock did not trade at all.  Rosenberg Decl. at ¶10.  The closing market price for USI shares on October 29, 2001 was 64 cents per share (90 cents per share adjusted for the 4:3 stock split), while Kovens and Paul had agreed to a sales price of $2.14 per share ( $2.85 adjusted for the 4:3 stock split) , reflecting a control premium in excess of three times the reported market price of the stock.  Rosenberg Decl. at ¶10.  The closing price of USI stock on the date of the breach, January 8, 2002, does not reflect any premium, let alone a 300% premium, for the block of 228,000 (171,000 shares adjusted for the stock split) held or controlled by Paul.Rosenberg Decl. at ¶10.  Given all of these factors, the value of the  USI stock as of January 28, 2002 could be the same as the value on September 28, 2005 (despite the difference in the listed price) because the January 28, 2002 trading price informs, but does not bound, the value of the stock at that time for the purpose of a damages analysis.  Rosenberg Decl. at ¶10.

15

The historical data regarding the sales prices of the USI stock through September 28, 2005, the fact that those prices consistently trended upward, and Paul's own stock sales constituted the best data available for valuing the damage suffered by Kovens.   Rosenberg Decl. at ¶11. In a case like this, where a control block of thinly traded stock is the subject of the agreement, it is more accurate to look at the actual performance of the stock over time to determine value, rather than to look only at the trading price on the date of breach.   Rosenberg Decl. at ¶11.  Paul's Trial Exhibit I, the September 29, 2005 print-out from "http://finance.yahoo.com" listing the October 22, 2001 through August 1, 2002 trade information for USI shares.  Rosenberg Decl. at ¶5.  The price per share during this time period ranged from $.67 ($0.90 adjusted for the 4:3 stock split) to $3.525 ( $4.70 per share adjusted for the 4:3 stock split).  Rosenberg Decl. at ¶5.  The Exhibit reflects that the per share prices trended upward from the beginning of the period through the end of the period.  Rosenberg Decl. at ¶5.  The upper right hand corner of Paul's Trial Exhibit I also reflects that the price of the USI shares on September 28, 2005 (the day before the date of the print-out and approximately one week before trial) was $18.17 per share.   Rosenberg Decl. at ¶6. See Sharp v. United States, 191 U.S. 341, 349 1903 ("[t]he price at the stock exchange of shares of stock in corporations which are there offered for sale or dealt in *is some evidence* of the value of such shares") (emphasis added).

By late 2001 and early 2002, Kovens already owned in excess of 10% of the outstanding stock of USI.  Rosenberg Decl. at ¶12.  As such, he was subject to the sale restrictions of Rule 144 promulgated under the Securities Act of 1933.   See Rosenberg Decl. at ¶12; 17 C.F.R. 230.144, et seq. (2005).  Thus, using historical data to value the damages suffered by Kovens appropriately reflects the fact that Rule 144 would have restricted the number of shares that Kovens could sell during certain

16

periods as set forth in Rule 144.  Rosenberg Decl. at ¶12. This is an additional reason why the market

sales price of USI stock on the date of breach does not represent the true value to Kovens of his

contract with Paul.  Rosenberg Decl. at ¶12.

The determination of Kovens' damages should also reflect the fact that the agreement between

Kovens and Paul was not just a contract to buy stock, but rather, it was  (1) a contract to buy stock,

which would give Kovens more than a 50% interest in USI, and (2) an agreement to call a special

meeting of shareholders where a new slate of members of the Board of Directors would be elected

(who would opt out of the  Maryland Control Share Acquisition Act (Md. Code, Corp & Assoc. §§3-

701 et seq.).  Rosenberg Decl. at ¶13.  Again, the market price on January 8, 2002 does not reflect the

value of this contract to Kovens.  Rosenberg Decl. at ¶13. The damages recoverable by Kovens should

include not only the value of his right to buy 228,000 shares  (171,000 shares split adjusted for the 4:3

stock dividend in April 2004) of USI stock from Paul, but also the ability to call a special meeting of

shareholders so that he could regain control of USI, be reinstated in management and direct the

business of the company. Rosenberg Decl. at ¶13.  These special factors constitute a control premium

unique to Kovens, that is not reflected in the market for the stock on January 8, 2002.  Rosenberg

Decl. at ¶13.

Lawrence Fund, L.L.P. v. Helionetics, Inc., 1996 WL 352911 (S.D.N.Y. 1996) involved a

defendant's breach of its agreement to register common stock in conformance with the terms of its

private placement memorandum ("PPM") pursuant to which the plaintiff's had purchased its shares.

The private placement memorandum was dated June 18, 1993 and a full warrant was exercisable

within two years of that date to purchase one share of stock at a purchase price of $2.20.  1996 WL

352911, *1 (S.D.N.Y. 1996). The shares could not be re-sold until they were registered or a registration exemption became available. 1996 WL 352911, *2. Under certain conditions set forth in the PPM, a purchaser could request registration. Id. As of November 17, 1993, the conditions for registration had been met and defendant became obligated on that date to register the stock but failed to do so. Id. The parties agreed that plaintiff's damages should be valued as of the date the registration statement could have been expected to become available. Id. at *3. They did not agree on which date that was. Id. at *3. Bearing on the court's resolution of the issue was the notion that "in calculating damages uncertainties as to date and, therefore, proceeds from sale are to be resolved in favor of plaintiffs." Id. at *2. Plaintiff argued the shares should be valued as of January 1994 when the average per share price was $5.63 per share. Id. at *3. The defendant argued that because of all the steps it had to take to register the stock (e.g., drafting the registration statement, printing the prospectus, responding to SEC comments), the earliest it could have registered the stock was June 1994 when the average per share price was $3.17 per share. Id. The Court did not think it reasonable that it would have taken the defendant as long as it claimed to accomplish what it needed to accomplish. Id. at *3-*5. The court concluded that had the defendants begun to undertake their contractual obligations on November 17, 1993, the plaintiffs most likely could have sold their shares by January 1994 and plaintiffs' damages should therefore be based on the average price of stock during that month ($5.63 per share). Id. at *6. In a footnote, the Court stated: "To the extent there is *any* doubt, as indicated earlier, it must be resolved in favor of plaintiffs." Id. at *6 n.11. Finally, the defendants also argued that a deduction should be made for the shares which at that point during the litigation the plaintiffs continued to hold. Id. at *6. The plaintiffs argued that the shares had no value because they could not

18

be sold until July 29, 1996 due to Rule 144 restrictions.  Id.  The court disagreed: "[Plaintiffs'] right to realize the proceeds from such sales in about a month from now *is* worth some amount now, and, as July 29, 1996 approaches, the value of the shares presumably will approach the market price of unrestricted shares."  Id.  As a result, damages had to be reduced to reflect the value of those shares. Id.  The court continued: "However, that deduction should also reflect the fact that plaintiffs must wait until over a month to dispose of them.  While market price movements reflect many factors and there is no certain way to predict whether the stock will have gone up or down by July 29, it is reasonable to assume that given the state of the company, the price most likely will decrease somewhat.  While it has fluctuated some, the price of the stock overall since the hearing has decreased by 47%.  Again, the uncertainty as to exact price is to be borne by the defendants who are liable herein, and plaintiffs must be given the benefit of the doubt."  Id.

There is no doubt as to how the USI stock has performed since 2002 - Kovens has the benefit of the actual historical performance of the stock.  There is also no doubt that Rule 144 would have prevented Kovens from a wholesale disposal of the shares and would have prevented Kovens from selling any shares on any date close in time to when Paul should have delivered the shares.  At this stage, given Rosenberg's damages analysis (both in his Supplemental Report and in his Declaration), as well as Paul's testimony regarding his substantial profit from his sale on the open market of the shares he had agreed to sell to Kovens and Paul's evidence that the shares were trading at more than $18.00 per share just before trial, if there is any uncertainty at this juncture as to the precise calculation of Kovens' damages, that uncertainty must be borne by Defendant.

## VI.     THIS COURT SHOULD CERTIFY THE DAMAGES QUESTION TO THE MARYLAND COURT OF APPEALS

If the Court is inclined to award Plaintiff zero damages, Plaintiff requests the Court to certify the question of how damages should be calculated under Maryland law to the Court of Appeals of Maryland pursuant to Maryland Courts and Judicial Proceedings, Section 12-603 and under the certification procedure set forth in Maryland Rule 8-305.  Although certification is discretionary, Lehman Bros. V. Schein, 416 U.S. 386, 390-91 (1974), it is appropriate in this circumstance.   The Maryland Court of Appeals is empowered to answer questions of law certified to it by a court of the United States "if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State." Md. Code Ann. Cts. & Jud. Proc. §12-603.  Thus, if this Court determines that the case law proffered by Plaintiff on the issue of damages is not controlling, certification to the Maryland Court of Appeals is appropriate.

### CONCLUSION

For the foregoing reasons, as well as those stated in Kovens' Opposition to Paul's Motion in Limine, and those stated in open court during the trial proceedings, Plaintiff Michael L. Kovens respectfully requests that judgment be entered in his favor in the amount of $3,655,410.

20

Respectfully submitted,

COOTER, MANGOLD, TOMPERT &
  WAYSON, L.L.P.


        /s/
Dale A. Cooter, Esq., #2104
James E. Tompert, Esq., #9857
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C. 20015
(202)537-0700

*Attorneys for Plaintiff*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 25th day of October 2005, a copy of the foregoing Memorandum

Law and supporting Exhibits was served electronically on:

   David Jaroslawicz, Esq.
   Jaroslawicz & Jaros
   150 William Street
   New York, New York 10038


and was also served electronically, and by facsimile on:


   Jon Paul Robbins, Esq.
   260 Madison Avenue
   New York, NY 10016



        /s/
     _____
     James E. Tompert

22