UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/4/09
```

-------------------------------------------------x

MICHAEL KOVENS,

                            Plaintiff,

           – against –

BRUCE PAUL,

                        Defendant.

-------------------------------------------------x

04 Civ. 2238 (TPG)

**OPINION**

       This action was brought to trial, and a jury found that defendant Bruce Paul had breached a contract to sell 171,000 shares in Universal Security Instruments ("USI") to plaintiff Michael Kovens, and to help Kovens call a special shareholders' meeting of USI.  The court determined that it would rule on the question of damages.[1]  This ruling has unfortunately been long delayed.  But the court has now determined that plaintiff is entitled to no damages.

       The following three issues need to be resolved at this juncture.

       First, plaintiff argues that Maryland law, rather than New York law, should determine the standard for measuring damages.  Contrary to plaintiff's contention, however, New York and Maryland law both require the same measure of damages, and there is thus no conflict for the court to resolve.

---

[1] The standard for measuring damages is a legal determination.  See Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 196 (2d Cir. 2003).  In this case, application of the selected measure of damages requires only a mechanical, arithmetical calculation.

Second, the parties offer competing measures of damages, leading to two possible results.  Kovens argues that damages should be measured based on the stock's price at the time of trial, and that he should therefore recover over \$3.6 million.  Paul argues that damages should be measured based on either the stock's price at the time the contract was breached or the contract price itself, and that Kovens should therefore recover nothing.  Paul's position is correct.  Under either New York or Maryland law, damages are measured as the difference between the contract price and the fair market value of the shares at the time of breach.  Because the best indicator of the shares' value at the time of breach is the contract price, plaintiff's damages are zero.

Third, Paul asks the court to declare the contract illegal under Maryland law and therefore unenforceable.  However, the court has determined that the contract was not illegal or unenforceable under Maryland law.

## Background

After a trial in October 2005, the jury found for Kovens on liability, answering three special interrogatories in the affirmative.  First, the jury found that Kovens and Paul entered into a contract for Paul to sell Kovens 171,000 shares of USI.  Second, the jury found that Paul agreed to assist Kovens in calling a special shareholders' meeting, and to complete the stock sale after the meeting.  Third, the jury found that Paul breached these agreements.

The following is a summary of the evidence at trial.  The extent of the summary is required mainly for resolving the claim that the contract was illegal.

- 2 -

Kovens, a Maryland resident, founded USI, a Maryland-based company that manufactures burglar alarms. Kovens served as USI's CEO and as a member of its board of directors from USI's founding in 1969 until a board meeting on October 22, 2001. At the October 22 meeting, however, his co-directors, Steve Knepper and Harvey Grossblatt, voted to remove Kovens from his positions as CEO and chairman of the board, and to install Knepper in his place.

Following this meeting, Kovens developed a plan to regain control of USI by acquiring a controlling interest in the company. At the time, there were about 950,000 shares of USI outstanding, and the stock was thinly traded on the over-the-counter market. Kovens and his family together owned approximately 33% of the shares.

Kovens soon determined from shareholder records that Paul owned 120,000 shares, or about 12% of the outstanding shares, and he offered to buy Paul's entire holdings at a price of $2.70 per share. At the time, USI shares were trading on the open market for $1 or less per share. Paul agreed to sell his shares, and to arrange the sale of an additional 51,000 shares held by his family and friends, at a price of $2.85 per share. However, he required Kovens to wire the funds to an account at the New York offices of Morgan Stanley. Kovens accepted this offer, opened an account with Morgan Stanley, and wired $512,500.98 to that account. This included a broker's fee of $25,000, plus $150.98 to cover transfer fees, as well as $2.85 per share for 171,000 shares.

On November 1, however, Kovens decided not to purchase the shares immediately.  His attorneys had informed him that under the Maryland Control Share Acquisition Act ("MCSAA"), the purchased shares would not have voting rights because they would have been acquired in a "control share acquisition." See Md. Code, Corps. & Ass'ns §§ 3-701 to 3-710.

On November 2, Kovens and Paul met at the New York offices of Paul's attorney.  The parties dispute precisely what happened during that meeting.

According to Kovens, Paul agreed that (1) he and his group would provide the signatures necessary for Kovens to request a special shareholders' meeting; (2) he would vote for the replacement of the existing directors with a slate of directors friendly to Kovens who could then opt out of the voting rights limitation under the MCSAA; and (3) he would sell the 171,000 shares to Kovens after the meeting.  Paul, however, testified that he agreed to help Kovens call the meeting, but that he did not agree to vote a certain way or sell the shares after the meeting.  The testimony of other witnesses, including Kovens's attorneys, generally corroborated Paul's testimony.  The agreement was never reflected in written documents, including a Form 13D that Kovens filed with the Securities and Exchange Commission ("SEC") later that year.

Irrespective, Kovens was able to collect the requisite signatures, and on December 24, he gave a demand for the special meeting to Grossblatt in his capacity as USI's secretary.  By January 2002, however, Paul announced that he no longer wished to sell Kovens the stock or help Kovens call a special meeting.  Morgan Stanley wired the funds back to Kovens on January 9.

Paul and his affiliates subsequently sold most of their USI stock for $15 or more per share, at a profit of millions of dollars.  At no time, however, did Kovens attempt to buy a replacement block of shares on the open market.

## **Damages**

Kovens has consistently argued that he should have, as damages, the benefit of his contract to purchase the block of 171,000 shares, and that this benefit can only be conferred on him by allowing him to recover based on the increase in value of the stock (which he was entitled to own) up to the time of trial.  Thus, the damages should be the difference between the enhanced value of the stock at the time of trial and the contract price.  Paul argues that the damages must be based on the difference, if any, between the value of the stock at the time of breach and the contract price—in effect, zero damages.

During the trial, the court discussed the issue of damages in terms of what the court considered to be certain practical considerations.  The court noted that the price of USI's stock was very low while Kovens was in control, and that the subsequent rise in the price occurred under different management.  The court stated that to accept Kovens's theory would involve the danger of speculation—that is, speculation as to how the company, and its stock price, would have fared if Kovens had regained control pursuant to the contract.  Indeed, the court noted that the rise in price had been achieved by different management and that it would be highly speculative to find that Kovens could have achieved the same result.  The court stated that Kovens had not presented a viable damages theory and had not called an actual appraiser

- 5 -

as a witness, even though there are ways to evaluate the value of a control
block of stock. The court voiced the opinion that there is no proof of damages
in the record. However, the court invited the parties to brief the damages issue
further. The rulings below are based on all the briefing and argument that has
been submitted on the issue of damages.

Choice of Law

Kovens argues that Maryland law should apply to this dispute because
USI is a Maryland corporation and Kovens is a Maryland resident. According
to Kovens, both the internal affairs doctrine and the center-of-gravity test weigh
in favor of applying Maryland law. Paul responds that the internal affairs
doctrine does not apply here, and that the center-of-gravity test favors the
application of New York law.

A federal court sitting in diversity must apply the choice-of-law analysis
of the forum state. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941).
Under New York's choice-of-law rules, the "first step in any case presenting a
potential choice of law issue is to determine whether there is an actual conflict
between the laws of the jurisdictions involved." In re Allstate Ins. Co., 81
N.Y.2d 219, 223 (1993); see also Beth Israel Med. Ctr. v. Horizon Blue Cross &
Blue Shield of N.J., Inc., 448 F.3d 573, 582 (2d Cir. 2006). Here, there is no
conflict because, as will be illustrated by the subsequent discussion, New York

- 6 -

and Maryland law call for the same standard regarding the measure of
damages.[2]

Measure of Damages

The jury found that Paul breached a contract to sell Kovens 171,000
shares in USI and to assist Kovens in calling a special shareholders' meeting.
Kovens has never articulated a theory of damages specifically with regard to
Paul's agreement to help Kovens call the special meeting, or offered any
evidence of the value of this assistance.  Rather, Kovens contends that the
premium he offered for the USI stock accounted for the value of Paul's
assistance, and that the damages calculation that Kovens proposes—which is
based entirely on the stock price—will therefore compensate him for the breach
of both components of the contract.

The parties agree about the basic formula for calculating damages here:
the difference between the value of the shares, at some point in time, and the
contract price.  The parties disagree, however, about whether to determine the
value of the shares at the time the contract was breached or at the time of trial.

Kovens argues that the stock price as of the date of trial should be used
in order to give him the benefit of the stock's increased value, which he would
have obtained by ownership.  Kovens believes that, as a matter of law, this is
the proper time at which to determine the value of the shares.  Alternatively, he
contends that the stock's value at the time of breach should be determined

---

[2] If there were a conflict between New York and Maryland law, New York law would
apply.  First, this is not a dispute about a corporation's internal affairs, so the internal affairs
doctrine does not apply.  Second, the contacts in this case weigh in favor of applying New York
law.

based on its price at the time of trial.  According to Kovens, an assessment of the stock's value at the time of breach in 2001 should incorporate the value of the stock's future appreciation.  Thus, the price at the time of trial offered the best available evidence of the stock's value in 2001—both because there was actual evidence of the stock's appreciation between 2001 and 2005, and because Kovens, as a company insider, was bound by SEC Rule 144 to hold the Paul stock throughout that period.  Just before trial, on September 28, 2005, USI's stock price was $18.17.  After adjusting for a four-for-three stock split that occurred in April 2004, this translates to a market value (on a pre-split basis) of $24.23 per share.  Thus, Kovens claims that he is entitled to damages of $21.38 per share (i.e., the market value of $24.23 per share, less the contract price of $2.85 per share), amounting to total damages for 171,000 shares of $3,655,410.

Paul argues that the shares should be valued as of the date that the contract was breached.  Although Paul advocates the use of the stock's market price at the time of breach, he points out that even if the contract price is used as an indicator of the stock's value, Kovens's damages would be zero.

Under both New York and Maryland law, the general measure of damages in a breach-of-contract case is expectation damages.  J.R. Loftus, Inc. v. White, 85 N.Y.2d 874, 877 (1995); Hall v. Lovell Regency Homes Ltd. P'ship, 708 A.2d 344, 350 (Md. Ct. Spec. App. 1998).  In the case of a breach of a contract to sell securities, expectation damages are calculated as "the difference between the agreed price of the shares and the fair market value at

the time of the breach." Aroneck v. Atkin, 90 A.D.2d 966, 966 (4th Dep't 1982); see also Simon v. Electrospace Corp., 28 N.Y.2d 136, 145 (1971); Levine v. Chambers, 118 A. 798, 800 (Md. 1922); Maryland Law Encyclopedia § 83 (2008).  This formulation is said to award expectation damages by putting "the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 196 (2d Cir. 2003).

        This formulation has routinely been applied to contracts for securities that are thinly traded, as were those of USI.  See, e.g., Aroneck, 90 A.D.2d at 966 (shares in a seemingly small "automobile shredding" business); Boyce v. Soundview Tech. Group, No. 03-cv-2159, 2004 WL 2334081, at *3 (S.D.N.Y. Oct. 14, 2004) (option to purchase shares in a private company whose "stock was not actively traded on any exchange"); Oscar Gruss, 337 F.3d at 189 (warrants in a company of which 68% of the stock was owned by three individuals).  Thus, this measure of damages does not require that a plaintiff be able to "cover" the sale by acquiring the same quantity of the asset from another source.  It is also consistent with the U.C.C.'s dictate that damages are calculated as the difference between the contract price and "the market price at the time when the buyer learned of the breach." N.Y. U.C.C. § 2-713(1); Md. Code, Commercial Law § 2-713 (same); see also Rosensaft v. Ashton Tech. Group, No. 97-cv-3138, 1998 WL 101959, at *2 (S.D.N.Y. Mar. 5, 1998) (applying the U.C.C. measure of damages to a securities contract "despite the

fact that 'investment securities' are excluded from the definition of 'goods'" in the U.C.C.).

The court therefore rules that the proper measure of damages in the present case is the difference between the value of the stock at the time of breach (January 2, 2002) and the contract price.  The court rejects the theory of Kovens that the value of the stock at the time of trial should be used.

It would violate two core principles to rely on the stock's price at the time of trial.  First, changes in value after breach are not relevant to the calculation of damages.  Sharma v. Skaarup Ship Mgmt. Corp., 916 F.2d 820, 826 (2d Cir. 1990); Aroneck, 90 A.D.2d at 966; Simon, 28 N.Y.2d at 145; Fran Realty, Inc. v. Thomas, 354 A.2d 196, 204 (Md. Ct. Spec. App. 1976).  Instead, an asset's value at the time of breach inherently accounts for the asset's future appreciation.  Schonfeld v. Hilliard, 218 F.3d 164, 176 (2d Cir. 2000); Sharma, 916 F.2d at 826.  This rule also avoids exposing parties to a potentially limitless range of liability that depends on the vagaries of the stock market, unrelated developments in the company at issue, and the duration of pre-trial practice in ensuing litigation.

Second, damages must be proved to a "reasonable certainty," instead of relying on speculation.  Schonfeld, 218 F.3d at 182; Boyce, 2004 WL 2334081, at *3; Seton v. United Gold Network, LLC, No. 06-1246, 2008 WL 1925180, at *4 (D. Md. Apr. 30, 2008); Kleban v. Eghrari-Sabet, 920 A.2d 606, 627 (Md. Ct. Spec. App. 2007).  The approach urged by Kovens would clearly yield a speculative measure of damages.  If Kovens had successfully acquired control

- 10 -

of USI, he almost certainly would have altered the company's trajectory.  The stock's performance without his intervention therefore does not provide reasonably certain evidence of how the stock would have appreciated after the change in control.

Nor would the testimony of Kovens's proposed expert (whose testimony was not admitted) have provided reliable evidence of the value of the USI stock. Notably, the testimony that the expert would have offered was not an appraisal—it did not determine the stock's value based on data about the company or the price history of its stock.  See Amodio v. Amodio, 70 N.Y.2d 5, 6 (1987).  Rather, the analysis was limited to two elements:  the argument that the stock's price in 2005 was meaningful evidence of its value in 2001, and basic arithmetic based on this argument.  This argument will be discussed hereafter in this opinion.

In view of the above ruling, the question now is how to determine the shares' fair market value at the time of breach, the contract price not being in dispute.  The value issue is addressed by Schonfeld v. Hilliard, 218 F.3d at 178-79, in which the Second Circuit, applying New York law, described a framework for determining the market value of an asset.  If the asset is "actively traded on a standardized exchange," the value on that exchange would suffice.  Id. at 178.  However, if that value cannot be discerned, a court should apply the "hypothetical market standard."  Under that standard, the "'fair market value is the price at which the property would change hands between a willing buyer and a willing seller.'"  Id. (quoting United States v.

Cartwright, 411 U.S. 546, 551 (1973)).  In order to determine the hypothetical market value, a court can consider several types of evidence, including expert testimony, a recent sales price, the price at which a party offered to sell the asset, or the price offered in a contract that the defendant subsequently breached.  Id. at 178-79.

In this case, there are three potential sources for the fair market value of the stock at the time of breach.  Two obvious options are the price at which USI stock was trading on the open market at the time of the breach or the price at which Kovens and Paul agreed the stock would be sold.  Surprisingly enough, Kovens argues that the price at which the stock was trading at the time of trial was a reasonable proxy for its value at the time of breach.  Of these options, only the second—the price agreed upon by Kovens and Paul—offers reliable evidence of the stock's value.

The court can quickly dispose of the theory that the value at the time of trial can be used as the value at the time of breach, for the same reasons described earlier in dealing with the issue of the method of measuring damages.

The market price of the USI stock at the time of breach is also an unsatisfactory indicator of the value of the stock at issue here.  First, the block of shares that Kovens sought to purchase from Paul was not of a type freely available on the market—rather, it was a large block of shares that would have been difficult to acquire on the open market, especially because ownership in USI was concentrated in a small number of shareholders.  Second, the market

- 12 -

price does not account for the premium that Kovens placed on the shares because they would enable him to take control of the company. The stock's price on the open market at the time of breach therefore does not represent the fair market value of the stock that Paul agreed to sell Kovens.

The price agreed upon by Kovens and Paul, by contrast, does offer evidence of the actual value of the block of stock. That price accounts for the parties' expectations that the purchase would allow Kovens to regain control of USI, as well as for the difficulty that Kovens would have faced if he had attempted to acquire such a large block of shares on the open market. It also accounts for the value to Kovens of Paul's assistance in calling a special shareholders' meeting. It is therefore consistent with the Second Circuit's definition of fair market value as the price at which property would change hands between a willing buyer and a willing seller. Schonfeld, 218 F.3d at 178.

Kovens's remaining contentions are without merit. First, the cases that he relies on do not justify a different result. Although the discussion in Bamira v. Greenberg, 295 A.D.2d 206 (1st Dep't 2002), provides few details about the facts of that case, the claim there appears to have been primarily one of misappropriation of a partnership opportunity, not just breach of contract. Moreover, Kovens's interpretation of Bamira as requiring damages to be calculated as of the date of verdict is contrary to the holdings of numerous other New York cases. Mercantile Holdings, Inc. v. Keeshin, 633 N.E.2d 805 (Ill. Ct. App. 1993), concerned the breach of an assignment agreement for which stock was offered as collateral, not a contract for the sale of securities.

- 13 -

Finally, the decision in <u>American National Bank and Trust Co. of Chicago v.</u> <u>Erickson,</u> 452 N.E.2d 3, 6 (Ill. Ct. App. 1983), was based at least in part on the language of the specific contract at issue in that case.

Second, neither New York nor Maryland law supports plaintiff's "consequential damages" theory.  Kovens argues that the parties contemplated that Kovens would hold the USI stock for several years.  As a result, he contends, his inability to capitalize on its appreciation because of Paul's breach was a foreseeable result of the breach, and the stock's appreciation therefore constitutes consequential damages.  This argument is misplaced.  A claim for consequential damages does not entitle a plaintiff to avoid the rule that damages must be measured to a reasonable certainty as of the date of breach. In other words, once it is determined that consequential damages may be awarded in a given case, it is still necessary to determine what the stock's fair market value was at the time of breach.  <u>See</u> <u>Schonfeld</u>, 218 F.3d at 177 (using fair market value as the measure of consequential damages); <u>Munday v. Waste</u> <u>Mgmt. of N. Am., Inc.</u>, 997 F. Supp. 681, 685 (D. Md. 1998) (using expectation damages as the measure of consequential damages).

Third, although Kovens is correct that Paul bears the risk of uncertainty regarding the amount of damages, that principle may be invoked only once a "plaintiff has demonstrated the amount of damages with reasonable certainty." <u>Boyce</u>, 2004 WL 2334081, at *3.  This "wrongdoer rule" therefore does not permit the court to resolve the uncertainty about how USI would have fared

- 14 -

under Kovens's leadership by awarding damages based completely on
speculation favorable to Kovens.

In summary, an expectation damages award in this case requires the
court to calculate damages as the difference between the contract price and the
fair market value of the shares at the time of the breach.  Because the best
evidence of the shares' fair market value was the contract price, plaintiff's
damages are zero.

## **Illegality of the Contract**

Paul seeks judgment as a matter of law on the ground that the alleged
contract was illegal, and therefore unenforceable, because it would have
violated the MCSAA.  Paul argues that if he had fulfilled the contract's
requirement to vote his shares pursuant to Kovens's instructions, the vote
would have violated the MCSAA's provision depriving the shares of voting
rights.  Kovens disputes that the MCSAA makes such a contract illegal and
argues that this motion is procedurally inappropriate.  Because the court holds
that the contract was not illegal, however, the procedural arguments raised by
Kovens need not be addressed.

Illegal contracts are unenforceable under certain conditions.  Lloyd
Capital Corp. v. Pat Henchar, Inc., 80 N.Y.2d 124, 127 (1992); Springlake Corp.
v. Symmarron Ltd. P'ship, 569 A.2d 715, 719 (Md. App. 1990).  However, under
New York law, if a "statute does not provide expressly that its violation will
deprive the parties of their right to sue on the contract, and the denial of relief

- 15 -

is wholly out of proportion to the requirements of public policy," the contract will not be held unenforceable. Lloyd Capital, 80 N.Y.2d at 127.  Similarly, Maryland has not "adopted such a rigid rule that any contract made in violation of any statute is unenforceable"—rather, Maryland courts "examine the statute at issue and the public policy behind it in an attempt to discern whether the legislature intended for contracts made in violation of the statute to be void or unenforceable." Springlake, 569 A.2d at 718.  Among the relevant considerations are whether the statute was intended for the benefit of individuals like the defendant in the case at issue, and whether there are alternative sanctions in place to enforce the command of the statute.  Lloyd Capital, 80 N.Y.2d at 127-28.

The pertinent provision of the MCSAA states as follows:  "Control shares of the corporation acquired in a control share acquisition have no voting rights except to the extent approved by the stockholders at a [special shareholders'] meeting . . . ."  Md. Code, Corps. & Ass'ns § 3-702(a)(1).  The MCSAA also allows shareholders to amend the corporation's charter or bylaws to exempt future acquisitions from the statute.  Id. § 3-702(b).  Finally, the statute defines a "control share acquisition" as "the acquisition, directly or indirectly, . . . of ownership of, or the power to direct the exercise of voting power with respect to, . . . control shares."  Id. § 3-701(e)(1).

Thus, the statute does not prohibit contracts to sell control blocks of shares or the voting rights to control blocks of shares; in fact, it envisions such contracts.  However, the statute does indicate that if such an acquisition

- 16 -

occurs and the shareholders do not approve an exemption from the MCSAA, but the shares are nonetheless voted, then the vote will be invalid.

Since the MCSAA does not explicitly ban this type of contract, it can only be held unenforceable if required by public policy.  In enacting the MCSAA, the Maryland legislature does not appear to have been seeking to preclude parties from entering into control share acquisitions, but rather to structure the procedure under which such acquisitions occur.  Thus, the MCSAA appears designed to protect shareholders from unannounced takeovers, not to protect the participants in such takeovers, such as Paul, from the force of their own contracts.  In the event that control shares are then voted in violation of the MCSAA, shareholders can presumably avail themselves of the remedies of corporate law to challenge such a vote.  It seems quite unlikely that the legislature, in drafting a statute to govern the terms of acquisitions, sought implicitly to void all contracts in which the parties agreed to an acquisition of control shares but failed to comply with the procedure set forth by the statute. Since the court finds that the MCSAA was not intended for the protection of parties such as Paul, that other options exist to remedy violations of the statute, and that there is no evidence that the legislature intended to void such contracts, the court declines to hold the contract to be unenforceable.

Defendant's motion for judgment as a matter of law on that ground is therefore denied.

- 17 -

### **Conclusion**

The damages in this case are calculated as the difference between the contract price and the fair market value of the shares at the time of breach. Because the only reliable indicator of the shares' value is the contract price, plaintiff's damages are zero.

Defendant's motion to declare the contract illegal and unenforceable is denied.

The parties are directed to submit a proposed judgment reflecting the jury's verdict and this decision.

SO ORDERED.

Dated:  New York, New York
        March 2, 2009

Thomas P. Griesa
U.S.D.J.